UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

HIGH POINT SARL,

        Plaintiff,

   v.

T-MOBILE USA, INC.,

        Defendant,

   and

NOKIA SOLUTIONS AND NETWORKS
US, LLC,

        Intervenor-Defendant,

   and

ERICSSON, INC.,

        Intervenor-Defendant.

HONORABLE JOSEPH E. IRENAS

Civil No. 12-1453 (JEI/AMD)

**OPINION**

**APPEARANCES:**

DECHERT LLP
By:  Thomas P. Lihan, Esq.
    Robert D. Rhoad, Esq.
902 Carnegie Center
Suite 500
Princeton, NJ 08540-6532
    Counsel for High Point SARL

SCHNADER HARRISON SEGAL & LEWIS LLP
By:  Lisa J. Rodriguez, Esq.
Woodland Falls Corporate Park
220 Lake Drive East
Suite 200
Cherry Hill, NJ 08002-1165
    Counsel for T-Mobile USA, Inc.

1

DENTONS US LLP
By:  Marc S. Friedman, Esq.
1221 Avenue of the Americas
New York, NY 10020-1089
     Counsel for T-Mobile USA, Inc.

GRAHAM CURTIN, PA
By:  Thomas R. Curtin, Esq.
     George C. Jones, Esq.
4 Headquarters Plaza
P.O. Box 1991
Morristown, NJ 07962-1991
     Counsel for Alcatel-Lucent USA, Inc.

LERNER, DAVID, LITTENBERG, KRUMHOLZ & MENTLIK, ESQS.
By:  Jonathan A. David, Esq.
     Robert B. Hander, Esq.
     Roy Henry Wepner, Esq.
     William L. Mentlik, Esq.
600 South Avenue West
Westfield, NJ 07090
     Counsel for Ericsson, Inc.

KING & SPALDING LLP
By:  Allison Hoch Altersohn, Esq.
     Chandan Sarkar, Esq.
     Robert F. Perry, Esq.
1185 Avenue of the Americas
New York, NY 10036
     Counsel for Nokia Solutions and Networks US, LLC

CONNELL FOLEY LLP
By:  Liza M. Walsh, Esq.
     Katelyn O'Reilly, Esq.
85 Livingston Avenue
Roseland, NJ 07068
     Counsel for Nokia Solutions and Networks US, LLC

**IRENAS,** Senior United States District Judge:

This is a patent infringement suit brought by Plaintiff High Point SARL[1], which currently owns the four patents-in-suit: the '090 patent, the '308 patent, the '347 patent, and the '091 patent.[2] The patents disclose methods for designing and implementing cellular telephone network infrastructure equipment used in the receiving and transmitting of voice call traffic. Defendant T-Mobile bought the networking equipment at issue from at least three vendors: Intervenor-Defendants (1) Nokia Solutions and Networks US, LLC ("NSN"), and (2) Ericsson, Inc.; as well as non-parties (3) Alcatel USA Marketing, Inc. and Alcatel-Lucent USA, Inc. (collectively "ALU").[3]

Presently before the Court are two Motions for Summary Judgment on T-Mobile's affirmative defense of patent exhaustion filed by: (1) Ericsson; and (2) T-Mobile and NSN.

---

[1]  High Point is a non-practicing patent-assertion entity that acquired the patents in 2008.  All four patents expired in July, 2011.

[2]  U.S. Patent Numbers 5,195,090; 5,305,308; 5,184,347; and 5,195,091 respectively.

[3]  T-Mobile's Motion to Join ALU was administratively terminated without prejudice prior to the reassignment of this case to the undersigned.

For the reasons stated herein, both motions will be granted in their entirety.[4]

## I.

All four patents-in-suit were originally held by AT&T.  In 1988, AT&T entered into a cross-licensing agreement with Siemens, whereby AT&T granted to Siemens nonexclusive and nontransferable licenses to "make, have made, use, lease, sell and import" the equipment embodying at least some of the patents-in-suit.  (Lauridsen Decl. Ex. 22).

Several years later, in January, 1996, AT&T entered into another cross-license agreement, this time with Alcatel. (Lauridsen Decl. Ex. 38)  The Alcatel agreement is substantially similar to the Siemens agreement; AT&T granted to Alcatel nonexclusive and nontransferable licenses to "make, have made, use, lease, offer to sell, sell and import" the equipment embodying at least some of the patents-in-suit.  (Id.)

Not long after the Alcatel agreement was signed, in March, 1996, AT&T spun-off Lucent and assigned to it at least some of

---

[4]  High Point also moves for leave to file a brief in sur-reply to T-Mobile and NSN's reply brief. (Docket # 158)  While the proposed sur-reply is less than five pages in length, the Court does not find the brief particularly helpful.  It cites no new law and no new record evidence.  Rather, it attempts to explain and distinguish a Federal Circuit case, *Rembrandt II*, *see infra*, which was cited and discussed in earlier briefs.  The Court is able to analyze the applicable case law without the assistance of High Point's sur-reply.

4

the patents-in-suit.   Thereafter, in November, 1996, Lucent entered into a cross-licensing agreement with LME that is also similar to the Siemens and Alcatel agreements.   (David Decl. Ex. 6)  Lucent granted LME nonexclusive and nontransferable licenses to "make, have made, use, lease, sell and import" the equipment embodying at least some of the patents-in-suit. (Id.)

Thus, by 1996 at the latest, it appears that AT&T / Lucent had granted licenses to sell equipment embodying all of the patents-in-suit.[5]

Over the ensuing years, through various corporate combinations and sublicensing agreements which are discussed next, Ericsson, ALU, and NSN came to sell to T-Mobile the equipment practicing the methods of the patents-in-suit.[6]

Ericsson

---

[5] In September 2000 Lucent assigned the patents-in-suit to Avaya. Plaintiff High Point acquired the patents-in-suit from Avaya in March 2008.

[6]  High Point contends that T-Mobile also purchased networking equipment from Nokia in 2006 and 2007, prior to the creation of NSN. However, T-Mobile clearly has moved for summary judgment as to equipment it purchased from only three vendors: Ericsson, NSN, and ALU. See Moving Brief p. 2 ("These three companies-- Ericsson, NSN, and ALU-- sold T-Mobile *nearly all* the equipment that High Point accuses of performing the alleged patented invention, and all three are licensed.")(emphasis added); Reply Brief p. 11 (stating that T-Mobile does not include purchases from Nokia in the present motion).   Therefore, this opinion does not address any equipment that T-Mobile purchased from Nokia.

In 2013-- i.e., after this suit was filed, and after the patents had expired-- Ericsson's parent, LME, granted Ericsson a "nunc pro tunc" sublicense with an "effective date" of January 1, 2002.  The single-page document (excluding signature pages) states in relevant part,

> Effective, *nunc pro tunc*, as of [January 1, 2002], LME hereby grants to [Ericsson] . . . a worldwide, non-exclusive, paid-up, royalty-free sublicense to all of LME's rights relating to [the patents-in-suit] pursuant to . . . the Lucent Agreement.

(David Decl. Ex. 7)

"The Lucent Agreement" is the 1996 Cross-License Agreement between Lucent and LME.  (Id.)  It provides in relevant part,

> 1.03  Scope
>
> (a) The licenses granted herein are licenses to (i) make, have made, use, lease, sell and import LICENSED PRODUCTS, and (ii) convey to any direct or indirect customer of the grantee, with respect to any LICENSED PRODUCT which is sold or leased by such grantee to such customer, rights to use, import, and resell such LICENSED PRODUCT as sold or leased by such grantee (whether or not as part of a larger combination); provided, however, that no rights may be conveyed to customers with respect to any invention which is directed to (1) a combination of such LICENSED PRODUCT (sold or leased) with any other product, (2) a method or process which is other than the inherent use of such LICENSED PRODUCT itself (as sold or leased); or (3) a method or process involving the use of a LICENSED PRODUCT to manufacture (including associated testing) any other product.
>
> (b)  . . .
>
> (c)  The grant of each license hereunder includes the right to grant sublicenses within the scope of

6

> such license to a party's RELATED COMPANIES for so
> long as they remain its RELATED COMPANIES.   Any
> such sublicense may be made effective retroactively
> but not prior to the effective date hereof, nor
> prior to the sublicensee's becoming a RELATED
> COMPANY of such party.

(David Decl. Ex. 6).


ALU

Alcatel-Lucent USA, Inc. ("ALU Inc.") is a subsidiary of
Alcatel-Lucent.   Alcatel-Lucent was formed by the reverse
triangular merger of Alcatel and Lucent in 2006.

It appears undisputed that prior to the merger, ALU Inc.'s
predecessor in interest, Alcatel USA Marketing, Inc., a
subsidiary of Alcatel, sold the networking equipment to T-Mobile
pursuant to the AT&T-Alcatel cross-license agreement, which
automatically extended sublicenses to then-existing Alcatel
subsidiaries at the time the cross-license agreement was
executed.   (Lauridsen Ex. 38, 1.01(c)) ("The present respective
[subsidiaries] of the parties are deemed sublicensed, effective
as of the effective date of this Agreement.").

After the 2006 merger, Alcatel USA Marketing continued to
sell the networking equipment to T-Mobile just as it did prior
to the merger.

Then, in 2008, Alcatel USA Marketing merged with another
Alcatel-Lucent subsidiary to form ALU Inc.   ALU Inc. sold the

7

networking equipment to T-Mobile purportedly pursuant to the
AT&T-Alcatel cross-license agreement which, in addition to
automatically extending sublicenses to existing subsidiaries,
automatically extends sublicenses to "future respective
[subsidiaries] of the parties . . . effective as of the date on
which any such company becomes a [subsidiary]." (Lauridsen Ex.
38, 1.01(c))

<u>NSN</u>

In March 2009, Siemens granted Nokia Siemens Networks B.V.
"retroactively as of April 1, 2007, a sublicense within the
scope of Siemens' own license under [its] License Agreement
[with AT&T]" which is "subject to all applicable restrictions,
exceptions, obligations, liabilities, termination provisions and
other provisions in the License Agreement." (Lauridsen Decl.
Ex. 28) According to T-Mobile and NSN, this sublicense was
authorized under a 1995 letter amendment (also referred to as
the "Divestment Rider") to the AT&T-Siemens cross-license
agreement. (Lauridsen Decl. Ex. 24)

The next year, in 2010, Nokia Siemens Networks B.V. and NSN
executed a "Confirmatory License Agreement" (Lauridsen Decl. Ex.
36) wherein, effective April 1, 2007, Nokia Siemens Networks
B.V. granted NSN a sublicense under the AT&T-Siemens cross-
license agreement.

## II.

The district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In deciding a motion for summary judgment, the court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).  The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.

"The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item."  *Quanta Computer Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 625 (2008).  Additionally, with respect to sales of component parts of a patented system, the

parts must "substantially embody the patents in suit" in order to trigger exhaustion. *Id.* at 621.

Each issue is addressed in turn.

### A. "Authorized sale"

With respect to the authorized sale analysis, it is important to correctly state the issue presented. *Quanta* clearly states, "[e]xhaustion is triggered only by a sale *authorized by the patent holder*." 553 U.S. at 636 (citing *United States v. Univis Lens Co.*, 316 U.S. 241, 249 (1942))(emphasis added); *see also Tessera, Inc. v. ITC,* 646 F.3d 1357, 1369 (Fed. Cir. 2011) ("At issue here, as in *Quanta*, is *whether the patentee has authorized certain sales* of products embodying the asserted patent.") (emphasis added).

In the simplest case, where only one license agreement exists, the issue of whether the patent holder authorized a sale, and whether the vendor was authorized to sell, are one-in-the-same; the patent exhaustion analysis focuses on the one license agreement running directly between the patent holder and the licensee who is simultaneously the vendor.

Both *Quanta* and *Univis* are such cases. Thus, in *Quanta*, the patent holder, LGE, entered into a cross-licensing agreement with Intel, pursuant to which Intel sold to Quanta the equipment

practicing the patented methods.  553 U.S. at 623-24.  Intel was
the direct licensee of the patent holder and simultaneously the
vendor.

Likewise in *Univis*, the patent holder, Univis, entered into
licensing agreements with finishing retailers, prescription
retailers, and wholesalers who then sold the products
substantially embodying the patents.  316 U.S. at 244.  Once
again, the direct licensee of the patent holder was also the
vendor.

The facts of this case, however, are different.  Ericsson,
ALU, and NSN are not parties to the AT&T or Lucent cross-license
agreements.  Those vendors' purported authority to sell the
equipment at issue comes from sublicenses rather than from the
original cross-license agreements.  Thus, answering the question
of whether the patent holders-- in this case AT&T and Lucent--
authorized sales of the licensed products-- by Ericsson, ALU,
and NSN-- is a bit more complicated.

The inquiry must begin with whether the patent holder
authorized sales-- as opposed to whether the vendor was
authorized to sell under a separate agreement-- because the
doctrine of patent exhaustion serves to limit patent holders'
rights.  *See Quanta*, 553 U.S. at 621 ("For over 150 years this
Court has applied the doctrine of patent exhaustion to limit

patent rights that survive the initial authorized sale of a

patented item."). As more fully explained in *Univis,*

> the purpose of the patent law is fulfilled with
> respect to any particular article when the patentee
> has received his reward for the use of his
> invention by the sale of the article, and that once
> that purpose is realized the patent law affords no
> basis for restraining the use and enjoyment of the
> thing sold. In construing and applying the patent
> law so as to give effect to the public policy which
> limits the granted monopoly strictly to the terms
> of the statutory grant, the particular form or
> method by which the monopoly is sought to be
> extended is immaterial. The first vending of any
> article manufactured under a patent puts the
> article beyond the reach of the monopoly which that
> patent confers. Whether the licensee sells the
> patented article in its completed form or sells it
> before completion for the purpose of enabling the
> buyer to finish and sell it, he has equally parted
> with the article, and made it the vehicle for
> transferring to the buyer ownership of the
> invention with respect to that article. To that
> extent he has parted with his patent monopoly in
> either case, and has received in the purchase price
> every benefit of that monopoly which the patent law
> secures to him.

316 U.S. at 251-52 (internal citations omitted); *see also*

*Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1373 (Fed.

Cir. 2013) ("The rationale underlying the doctrine rests upon

the theory that an unconditional sale of a patented device

exhausts the patentee's right to control the purchaser's use of

12

that item because the patentee has bargained for and received full value for the goods.").[7]

Thus, it logically follows that the patent exhaustion analysis focuses on the agreement to which the patent holder is a party. Only that agreement reflects what the patent holder has bargained for. Only that agreement reflects the relevant transaction pursuant to which the patent holder contemplated sales of the patented items, whether through a direct licensee, or through a subsequent sublicensee. Upon the performance of the initial contract only, where the patent holder grants an unconditional license to sell the relevant equipment, does the law presume that the patent holder received an amount equal to

---

[7] *See generally United States v. Masonite Corp.*, 316 U.S. 265, 277-78 (1942) ("There are strict limitations on the power of the patentee to attach conditions to the use of the patented article. As Chief Justice Taney said in *Bloomer v. McQuewan*, 14 How. 539, 549, when the patented product 'passes to the hands of the purchaser, it is no longer within the limits of the monopoly. It passes outside of it, and is no longer under the protection of the act of Congress.' In applying that rule, this Court has quite consistently refused to allow the form into which the parties chose to cast the transaction to govern. The test has been whether or not there has been such a disposition of the article that it may fairly be said that the patentee has received his reward for the use of the article."); *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 516 (1917) ("[T]his court [has] . . . decided that the owner of a patent is not authorized by either the letter or the purpose of the law to fix, by notice, the price at which a patented article must be sold after the first sale of it, declaring that the right to vend is exhausted by a single, unconditional sale, the article sold being thereby carried outside the monopoly of the patent law and rendered free of every restriction which the vendor may attempt to put upon it.").

the full value of its patent monopoly.[8]  Any subsequent sublicense is therefore only relevant to the extent the original license agreement requires a sublicense.

With this understanding, the Court now turns to the parties' arguments concerning the licensing agreements between the patent holders (Lucent and AT&T) and their direct licensees (LME, Alcatel, and Siemens).

**1.**

High Point asserts one argument as to all three vendors: "T-Mobile's assembly and use of its multi-vendor network is an unauthorized combination excluded from all putative licenses." (High Point's Opposition to T-Mobile's Motion for Summary Judgment, p. 28)  It is undisputed that all three licenses at issue do exclude combinations.  However, the same argument was considered and rejected as irrelevant by the *Quanta* court:

> LGE argues that there was no authorized sale here because the License Agreement does not permit Intel to sell its products for use in combination

---

[8]  Indeed, after *Quanta*, some commentators have advised patent holders to use care in drafting license agreements so as to avoid "the risk that a license or covenant not to sue will be interpreted broadly" and therefore trigger patent exhaustion. *Patent Exhaustion After* Quanta *and* Transcore: *Protecting Your Right to Sue Third Parties*, Pat. Trademark & Copyright J. (BNA) No. 1930, at 518-520 (Aug. 21, 2009).  In particular, patent holders are advised that "if a component manufacturer is licensed, the agreement should include express language that the licensee fee is not for the entire patent right."  *Id.* at 520.

14

with non-Intel products to practice the LGE Patents. It cites *General Talking Pictures Corp. v. Western Elec. Co.*, 304 U.S. 175, 58 S. Ct. 849, 82 L. Ed. 1273, 1938 Dec. Comm'r Pat. 831 (1938), and *General Talking Pictures Corp. v. Western Elec. Co.*, 305 U.S. 124, 59 S. Ct. 116, 83 L. Ed. 81, 1938 Dec. Comm'r Pat. 841 (1938), in which the manufacturer sold patented amplifiers for commercial use, thereby breaching a license that limited the buyer to selling the amplifiers for private and home use. The Court held that exhaustion did not apply because the manufacturer had no authority to sell the amplifiers for commercial use, and the manufacturer 'could not convey to petitioner what both knew it was not authorized to sell.' 304 U.S., at 181, 58 S. Ct. 849, 82 L. Ed. 1273, 1938 Dec. Comm'r Pat. 831 LGE argues that the same principle applies here: Intel could not convey to Quanta what both knew it was not authorized to sell, i.e., the right to practice the patents with non-Intel parts.

LGE overlooks important aspects of the structure of the Intel-LGE transaction. Nothing in the License Agreement restricts Intel's right to sell its microprocessors and chipsets to purchasers who intend to combine them with non-Intel parts. It broadly permits Intel to 'make, use, [or] sell' products free of LGE's patent claims. . . .

LGE points out that the License Agreement specifically disclaimed any license to third parties to practice the patents by combining licensed products with other components. . . . But the question whether third parties received implied licenses is irrelevant because Quanta asserts its right to practice the patents based not on implied license but on exhaustion. And exhaustion turns only on Intel's own license to sell products practicing the LGE Patents.

*Quanta*, 553 U.S. at 636-37.

15

High Point makes no attempt to distinguish this case from *Quanta*, and this Court discerns no material distinction.  High Point's combination argument fails.

## 2.

As to Ericsson only, High Point expressly states in its opposition brief that the 1996 Lucent-LME Cross-License Agreement authorized the sale of the equipment at issue. Moreover, the undisputed record evidence demonstrates that Lucent authorized those sales when it granted LME the right "to make, have made, use, lease, sell and import LICENSED PRODUCTS." (David Decl. Ex. 6)

It is also undisputed that: (1) the Lucent-LME Cross-License Agreement authorized LME to grant sublicenses-- and particularly relevant to this case, authorized *retroactive* sublicenses-- to LME's "related companies" as that term is defined in the agreement (David Decl. Ex. 6); (2) that Ericsson was a "related company"[9]; and (3) LME did, in fact, grant Ericsson a retroactive sublicense.

---

[9]  At oral argument on the instant motions, counsel for Ericsson stated that LME has always been a holding company only, and therefore it may be inferred that when Lucent entered into a cross-license agreement with LME, Lucent contemplated that sales would be accomplished through a sublicensee.

Thus, Ericsson and T-Mobile argue, Ericsson's sales to T-Mobile were authorized because every requirement of the Lucent-LME Cross-License Agreement was satisfied.

High Point, however, argues that the retroactive sublicense had no legal effect because it was executed in 2013, i.e., after the cross-license agreement expired in 2011.  According to High Point, LME's authority to grant retroactive sublicenses expired upon the expiration of the cross-license agreement's term, which was coextensive with the patents' terms.  But High Point offers no authority for why this should be so, nor any authority for why it should matter in the patent exhaustion analysis.

The Cross-License Agreement places no limits on when retroactive sublicenses may be granted, therefore the Court holds that Lucent authorized the retroactive sublicense that LME granted to Ericsson, and therefore authorized the sales Ericsson made to T-Mobile.

### 3.

As to ALU, T-Mobile's argument in support of its Motion for Summary Judgment is relatively simple:  Paragraph 1.01(c) of the AT&T-Alcatel Cross-License Agreement (Lauridsen Ex. 38) automatically grants sublicenses to sell the equipment practicing the patented methods to all present and future subsidiaries, which Alcatel USA Marketing, Inc. and Alcatel-

17

Lucent USA, Inc. (collectively "ALU") undisputedly are.  Thus, T-Mobile concludes, the sales of equipment from ALU to T-Mobile are authorized for patent exhaustion purposes.

High Point attacks T-Mobile's position on three fronts, arguing: (1) the patents-in-suit are not "licensed patents" as that term is defined in the AT&T-Alcatel Cross-License Agreement; (2) that issues of material fact exist as to whether the specific equipment ALU sold T-Mobile-- the "media gateways" ("MGWs")[10]-- were covered by the cross-license agreement; and (3) the cross-license agreement "ceased to exist" following the Alcatel/Lucent mergers in 2006 and 2008.  All three arguments fail.

As to the first issue, the cross-license defines "LICENSED PATENTS" as patents "for which a first application was filed . . . prior to the termination of the THREE YEAR PERIOD" ending December 31, 2006.  (Lauridsen Ex. 38)  High Point argues that because the three year period is defined as "the period commencing on January 1, 1994 and ending on December 31, 1996," (Id.) "only patents with a first filing date within" the three year period are covered by the license.

_____

[10]  Unlike Ericsson and NSN, who sold T-Mobile more than one type of equipment (Erisson sold MGWs, RNCs, and Node Bs; NSN sold Node Bs and RNCs), ALU only sold MGWs to T-Mobile.  (See T-Mobile's Moving Brief, p. 10)

It is undisputed that the relevant filing date for all patents-in-suit is July 9, 1991, therefore, according to High Point, the patents-in-suit are not licensed.

The Court agrees with T-Mobile that High Point's proposed interpretation of the cross-license conflicts with the plain language of the agreement which only requires that an application be filed prior to the end of the three year period, i.e., prior to December 31, 1996.  High Point's proffered interpretation would change "prior to the termination of" the three year period to "during" the three year period.

It is undisputed that the relevant filing date for the patents-in-suit is prior to December 31, 1996, therefore the patents-in-suit are covered by the cross-license agreement.

As to the second issue, the cross-license agreement grants a license to sell "any or all products and services of the kinds which are furnished or used by ALCATEL or any of its present RELATED COMPANIES . . . on the effective date of this Agreement." (Lauridsen Ex. 38)  The effective date of the agreement is January 1, 1996.  (Id.)

High Point relies on record evidence from which, it asserts, a reasonable factfinder could conclude that Alcatel was not furnishing or using MGWs as of 1996.  High Point correctly notes that the only evidence in the record concerning ALU's sales of the MGWs at issue is an agreement dated 2004.

(Lauridsen Ex. 46)  Further, High Point argues that a factfinder could reasonably infer that ALU was not selling MGWs prior to 2004 because the record demonstrates that in 2004 ALU acquired the company that sold the MGWs (Spatial Communications Technologies) to fill a hole in ALU's product line.  (Edwards Decl. Ex. G)  Thus, High Point reasons, a reasonable factfinder could find that Alcatel was not furnishing or using the MGWs in 1996, and therefore could further conclude that ALU had no license to sell the MGWs to T-Mobile.

High Point's argument, however, misses the relevant legal inquiry.  As T-Mobile observes, there can be no dispute that Alcatel was not furnishing or using MGWs in 1996 because MGWs did not exist in 1996.  Thus, the question cannot possibly be whether, in 1996, AT&T granted Alcatel a license to sell MGWs. Rather, the relevant question is whether Alcatel or any of its related companies were furnishing or using "any . . . products . . . of [a] kind" like MGWs in 1996.  (Lauridsen Ex. 38)

T-Mobile argues, and the Court agrees, that *Rembrandt Data Technologies, LP v. AOL, LLC et al.,* 641 F.3d 1331 (Fed. Cir. 2011)("*Rembrandt II*") informs this analysis.  In *Rembrandt II* the Federal Circuit affirmed the district court's interpretation of a license agreement with language similar to the language at issue here.  The agreement provided that sublicences could be granted to divested businesses, but only as "to products and

20

services sold by the future divested business prior to its
divestiture." *Id.* at 1338.

The Federal Circuit observed that the relevant agreements
"specif[ied] product types using general, functional terms," and
therefore concluded that a "broad interpretation of 'products',"
rather than a narrow interpretation which would limit the
license agreement to specific product models, was warranted.
*Rembrandt II*, 641 F.3d at 1338.  Since the relevant agreements
defined "'licensed products'" as "'data communication station
systems'" and "'digital transmission systems,'" the Federal
Circuit agreed with the district court that "the term 'products'
covers 'modems generally, not the specific types of modems in
production at the time of the sublicense and/or divestiture.'"
*Id.*

Here, the language of the AT&T-Alcatel License Agreement is
even broader than the relevant language in *Rembrandt II*.  The
title page of the AT&T-Alcatel agreement reads, "Patent License
Agreement between [AT&T] and [Alcatel], effective as of January
1, 1996, *Relating to the Products and Services of the Businesses
of the Parties*." (Lauridsen Ex. 38) (emphasis added).  Rather
than limiting licensed products to certain kinds of
communication and transmission systems, as the agreements in
*Rembrandt II* did, the agreement here does not define a class of
licensed products.  It broadly states,

> AT&T . . . grants to ALCATEL, . . . nonexclusive
> and nontransferable licenses to make, have made,
> use, lease, offer to sell, sell and import any or
> all products and services of the kinds which are
> furnished or used by ALCATEL or any of its
> present RELATED COMPANIES in the operation of the
> business in which ALCATEL or any such RELATED
> COMPANY is engaged on the effective date of this
> Agreement.

(Id.)[11]  Indeed, it is difficult to hypothesize a broader grant

of a license.

Thus, in order to prevail on the authorization issue, T-

Mobile must only produce evidence supporting a conclusion that

MGWs are of the kind of products that either Alcatel or one of

its related companies were furnishing or using in the operation

of their businesses on January 1, 1996.  It has satisfied its

burden in this regard because High Point does not dispute that

Alcatel sold "switching systems" in 1996, and that MGWs are a

type of switching system.  (See High Point's Response to T-

Mobile / NSN's Statement of Undisputed Facts ¶ 124; High Point's

Opposition Brief, p. 33, 35-38).

Accordingly, a reasonable factfinder could only conclude

that AT&T authorized the sale of the MGWs that T-Mobile

purchased from ALU.

---

[11]  The Agreement expressly states that "no rights are granted to
ALCATEL for TELECOMMUNICATIONS SERVICES, SEMICONDUCTOR
APPARATUS, and DATA PROCESSING APPARATUS," however, High Point
does not argue that MGWs or similar kinds of products fall
within this exception.

As to the third and last issue, High Point's argument that the mergers occurring in 2006 and 2008 terminated the cross-license agreement is incorrect as a matter of law.  High Point argues that the mergers triggered the non-assignability clause in the cross-license agreement because the mergers resulted in an unauthorized transfer of the license.

"[A] reverse triangular merger generally is not an assignment by operation of law." *Meso Scale Diagnostics, LLC v. Rocher Diagnostics GMBH*, 62 A.3d 62, 86 (Del. Ch. Ct. 2013);[12] *see generally* Revised Model Business Corporation Act § 11.07 ("A merger is not a conveyance, transfer or assignment. It does not give rise to claims for reverter or impairment of title based on a prohibited conveyance, transfer, or assignment.  It does not give rise to a claim that a contract with a party to the merger is no longer in effect on the ground of nonassignability, unless the contract specifically provides that it does not survive a merger.").  The mergers did not terminate the cross-license agreement.

In summary, as to ALU's sales to T-Mobile, all of High Point's arguments fail.  The Court holds that AT&T authorized the sales.

**4.**

---

[12]  It is undisputed that Delaware law governs this issue.

Lastly, as to NSN, T-Mobile and NSN argue that AT&T authorized NSN's sales of equipment to T-Mobile under the 1995 "Divestment Rider" to the AT&T-Siemens License (Lauridsen Ex. 24). The relevant portion of the Rider provides,

> [I]n the future, if SIEMENS . . . divests a portion of its present business, the licenses and rights granted in the subject agreement may be sublicensed to the divested business by the divesting company. Such sublicenses may be granted and retained *[a] only while the future divested business operates as a separately identifiable business and [b] only to the extent applicable to products and services sold by the future divested business prior to its divestiture.*

(Lauridsen Decl. Ex. 24)(emphasis added)

It is undisputed that Siemens granted a sublicense to NSN B.V., which later granted NSN an undisputedly valid retroactive sublicense, pursuant to which NSN sold to T-Mobile the equipment at issue.

However, High Point argues that the sublicense from Siemens to NSN B.V. was not authorized by AT&T because neither condition [a] nor [b] were satisfied. The Court disagrees.

High Point's arguments implicitly turn on the fact that Siemens' "divested business"-- a term not defined by either the rider or the cross-license agreement-- is a joint venture. It is undisputed that NSN B.V. was created by combining Siemens' carrier division with Nokia's infrastructure business. Thus, High Point argues, the divested Siemens carrier division did not

24

operate as a "separately identifiable business" because it undisputedly operated as one half of a joint venture.  According to High Point, the Siemens carrier division "never operated the divested Siemens business as a separately identifiable business *within* NSN B.V." because the whole point of the joint venture was to integrate the Siemens carrier division with Nokia's infrastructure business.  (Opposition Brief, p. 16) (emphasis added).

This argument rests on an unsupported interpretation of the term "separately identifiable."  The plain language of the rider indicates that the divested business need only operate separately *from Siemens*.  The entire rider addresses what happens in the event that Siemens "divests a portion of its business."  (Lauridsen Decl. Ex. 24)  It is undisputed that: (1) Siemens did divest its carrier division, and (2) after the joint venture transaction closed, the carrier division was no longer part of Siemens, but rather, part of a new and separate entity, NSN B.V.  Thus, Siemens' carrier division did operate separately from Siemens after the formation of the joint venture.

High Point's argument as to rider condition [b] fails for similar reasons.  According to High Point's argument, only some equipment coming from NSN B.V. was licensed (i.e., equipment that originated with Siemens prior to the joint venture) while

other equipment-- indeed, even the same *type* of equipment[13]-- was not, simply because it originated with Nokia prior to the joint venture.

Not only does High Point's argument make little practical sense, it conflicts with the language of the rider, which speaks of granting sublicenses "to the divested business." (Lauridsen Decl. Ex. 24)  Indeed, Siemens granted a sublicense to NSN B.V., not to its carrier division. (See Lauridsen Decl. Ex. 28 – sublicense agreement between Siemens and NSN B.V.)

The Court agrees with T-Mobile and NSN's observation that "High Point's position boils down to saying 'separately identifiable business' includes an unwritten, unstated prohibition on joint ventures." (T-Mobile / NSN's reply brief,

---

[13]  T-Mobile and NSN have introduced evidence that Siemens was selling wireless infrastructure equipment (of which RNCs and Node Bs are a later generation type) long before the divestment of Siemens' carrier division, and even before AT&T and Siemens entered into the original cross-license agreement. (Zott Dep. p. 155-157)  Thus, contrary to High Point's position, it does not matter that, according to High Point, the specific NSN models T-Mobile purchased were Nokia's pre-joint venture infrastructure models.  So long as the equipment coming from NSN was wireless infrastructure equipment, it does not matter whether it originated with Siemens or Nokia.

The equipment was covered by the cross-license agreement, as products "of the kinds which [were] furnished or used by [Siemens] or any RELATED COMPANY . . . on the effective date of" the cross-license agreement (Lauridsen Ex. 22)-- including new products and services that "normally evolve from the existing products and services (Lauridsen Ex. 23)-- which were also products sold by Siemens prior to the divestment of its carrier division into the joint venture. (Lauridsen Ex. 24)  *See Rembrandt II,* 641 F.3d at 1338.

p. 10)  High Point points to nothing in the record supporting an inference that such result was intended by AT&T when it entered into the Divestment Rider with Siemens.

High Point has failed raise a disputed issue of material fact as to whether AT&T authorized Siemens' sublicense to NSN B.V.  The Court holds that the sublicense was authorized under the Divestment Rider; and therefore concludes that AT&T authorized NSN's sale of equipment to T-Mobile.

### B.  "Substantial embodiment"

 As to the '090 patent, High Point concedes that if the sales of Node Bs were authorized, claims 28, 29, and 31 are exhausted: "[T]he accused Node Bs substantially embody the claimed inventions of those claims, such that the licensed sale of a Node B would exhaust High Point's rights with respect to those patent claims[.]"  (High Point's Opposition to T-Mobile / NSN's Motion for Summary Judgment, p. 33 n.14)

The parties dispute, however, the implications of this concession.  High Point argues that exhaustion applies only to claims 28, 29, and 31; "with respect to all of High Point's other asserted claims, High Point's rights are not exhausted." (High Point's Opposition to T-Mobile / NSN's Motion for Summary Judgment, p. 33 n.14)  T-Mobile takes the opposite position:

"High Point's concession means that all claims of the '090

Patent are exhausted." (Reply brief, p. 12)

*Keurig, Inc. v. Sturm Foods, Inc.,* 732 F.3d 1370 (Fed. Cir.

2013), conclusively forecloses High Point's argument. In that

case the Federal Circuit expressly rejected the patent holder's

"argument that patent exhaustion must be adjudicated on a claim-

by-claim basis." *Id.* at 1374. The Court explained,

> The [Supreme] Court's patent exhaustion
> jurisprudence has focused on the exhaustion of
> the patents at issue in their entirety, rather
> than the exhaustion of the claims at issue on an
> individual basis. . . . To permit a patentee to
> reserve specific claims from exhaustion would
> frustrate the purposes of the doctrine, one of
> which is to provide an efficient framework for
> determining when a patent right has been
> exhausted.

*Id.* (internal citations to *Quanta* and *Univis* omitted).

Accordingly, High Point's claim for infringement of the

'090 patent is barred by the doctrine of patent exhaustion.

Likewise, High Point's substantial embodiment argument as

to the '308, '347 and '091 patents also fails. In an apparent

attempt to avoid its own infringement contentions, which

implicitly concede that the Node Bs, RNCs, and MGWs

substantially embody at least one claim of the patents, High

Point argues that exhaustion does not apply to combinations of

the Node Bs, RNCs, and MGWs that were purchased from different

vendors. According to High Point, exhaustion only applies if

each "individual component" of T-Mobile's accused network substantially embodies each patent claim at issue.  (Opposition brief, p. 33-35)

T-Mobile correctly notes however, that High Point cites no legal authority for its position, and that High Point's position would severely undercut, if not eviscerate, the doctrine of patent exhaustion.

To accept High Point's argument would be to rule that T-Mobile could not use the equipment it purchased in an authorized sale in the manner in which it chooses to use it-- for example, that T-Mobile could not combine MGWs it purchased from ALU with Node Bs and RNCs it purchased from NSN.  Once an authorized sale of the equipment at issue had taken place, however, the patent holder (i.e., High Point, as successor-in-interest to AT&T and Lucent) lost all rights to control the purchaser's (i.e., T-Mobile's) post-sale use of that equipment.  Such is the fundamental operation of the patent exhaustion doctrine.  *See Keurig,* 732 F.3d at 1373 ("The rationale underlying the doctrine rests upon the theory that an unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of that item.").

Accordingly, the Court holds that the equipment at issue substantially embodies all four patents-in-suit.

**IV.**

For the above-stated reasons, the Court holds that the patent holders (AT&T and Lucent) authorized all three vendors' (Ericsson, ALU, and NSN) sales of the equipment substantially embodying the patents-in-suit, and therefore the doctrine of patent exhaustion bars High Point's infringement claims. Accordingly, the Motions for Summary Judgment will be granted in their entirety.[14]

An appropriate Order accompanies this Opinion.


Date:  October 15, 2014


                                   __s/ Joseph E. Irenas _____
                                   JOSEPH E. IRENAS, S.U.S.D.J.

---

[14]  The Court notes that this Opinion and accompanying Order do not dispose of the entire case; T-Mobile's counterclaims for non-infringement and invalidity remain, as well as Ericsson's numerous counterclaims.  Apparently, the issue regarding T-Mobile's use of Nokia equipment, *see* fn. 6 *supra*, also remains.